UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>NICOLE A. LESCARBEAU,<br>a/k/a "Nicole Coulibaly,"<br><br>Defendant | )<br>)<br>)<br>)  Criminal Nos.: 18-cr-10345 & 21-cr-10139<br>)<br>)<br>)<br>)<br>) |

## GOVERNMENT'S SENTENCING MEMORANDUM

The government hereby respectfully submits this memorandum in connection with the sentencing of defendant Nicole Lescarbeau.

### I.  THE OFFENSE CONDUCT

Lescarbeau, an office administrator, twice leveraged her position as a trusted insider to embezzle over $1.4 million from two separate non-profit employers. For this defendant, over her nearly seven-year scheme, theft became a way of life. In a deliberate and calculated fashion, Lescarbeau systematically stole over 700 times from two non-profits—who could have spent the stolen money on their missions of feeding the malnourished or housing the homeless—to fund a lifestyle to which she had grown accustomed. She repeatedly concealed her scheme to avoid detection. And she did not draw the line at getting caught. Rather, while on pre-trial release, Lescarbeau repeatedly stole from a second victim over six months.

**A.  Lescarbeau's $1.38 Million Embezzlement from Victim-1**

Between July 2013 and January 2018, Lescarbeau was employed as the chief operating officer at a non-profit focused on nutrition research, policy, and programs for developing countries based in Boston, Massachusetts ("Victim-1"). Pre-Sentence Report ("PSR") ¶¶ 8-9, 12, & 121. In that capacity, she was responsible for managing invoices, paying bills, and bookkeeping. PSR ¶ 9.

To fulfill these responsibilities, Lescarbeau had access to Victim-1's financial accounts, including the ability to prepare checks and send wires out of the non-profit's bank account and use of the non-profit's business credit cards.

In August 2013, the defendant began embezzling from Victim-1. Over the next four and a half years, Lescarbeau stole $1,389,317.45 from Victim-1. PSR ¶ 10. She did so by: (a) making over 350 separate unauthorized wire transfers totaling $534,590.98 to herself, her husband, and other individuals or entities to whom she owed money, PSR ¶ 17; (b) charging $311,848.62 in unauthorized purchases for herself and others with Victim-1's credit cards, PSR ¶ 20; and (c) issuing over 250 unauthorized checks totaling $542,877.82 from Victim-1's bank account made payable to herself, her husband, and other entities to whom she owed money, PSR ¶ 22. Lescarbeau affixed the electronic signatures of two colleagues, without their knowledge or approval, to make it appear as if the fraudulent checks were legitimate, and, at times, falsely added entries to the memo line to make it appear as if the checks were issued to pay for services rendered to Victim-1. PSR ¶¶ 23-25.

Lescarbeau, despite sending some of the stolen funds to support her husband's overseas business ventures, PSR ¶ 14, often used Victim-1's stolen money on personal expenses. PSR ¶ 11. By way of example, on April 21, 2021, the defendant's personal bank account had a balance of $69.27. The next day, Lescarbeau fraudulently issued a check drawn on Victim-1's bank account made payable to herself as a "vendor" in the amount of $1,216.78. She then deposited into her personal bank account. Thereafter, in April and May 2014, Lescarbeau used these stolen funds on, amongst other things, medical services (*e.g.*, $637.50 for a dentist), clothing (*e.g.*, $104.94 for Best of Everything), food (*e.g.*, $55.71 for Papa Ginos), and entertainment (*e.g.*, $16.56 for iTunes purchases).

Lescarbeau took steps to conceal her theft from Victim-1. PSR ¶¶ 26-30. By way of example, in January 2018, after a colleague asked whether a $70,000 check had been deposited into Victim-1's bank account, Lescarbeau replied: "It hasn't cleared, but I'll definitely keep my eye on it." PSR ¶ 29. In that e-mail, she included a purported screenshot from Victim-1's bank account that appeared to show a $70,000 check pending deposit on January 23, 2018. No such deposit ever took place. Rather, according to Victim-1's bank account records, the only transaction that occurred on the day in question was a wire transfer sending $2,250 to the defendant's husband. PSR ¶ 30.

In September 2018, a federal grand jury returned an indictment charging Lescarbeau with wire fraud, bank fraud, and aggravated identity theft in connection with her embezzlement from Victim-1. PSR ¶ 46. After her arrest, on September 27, 2018, the defendant was placed on pre-trial released under conditions that included "the defendant must not violate federal, state, or local law while on release." PSR ¶ 47. In December 2019, Lescarbeau pled guilty and was released on the same conditions that were imposed in September 2018.[1] PSR ¶ 51.

**B.      Lescarbeau's $57,000 Embezzlement on Pre-Trial Release from Victim-2**

In March 2019, while on pre-trial release, Lescarbeau applied for the position of officer administrator at a non-profit focused on providing affordable housing based in Brookline, Massachusetts ("Victim-2"). PSR ¶¶ 43 & 48. During the application process, Lescarbeau did not tell Victim-2 about her prior indictment and also concealed her maiden name—under which she was charged in the prior indictment—by using her married name, "Nicole Coulibaly." PSR ¶ 48. In fact, when applying, Lescarbeau sent Victim-2 a cover letter and resume under her married

---

[1] On the day she pled guilty, Lescarbeau embezzled from her second victim by way of an unauthorized wire transfer, via PayPal, to Target. PSR ¶ 57(h).

3

name that said she was an applicant with "[o]ver 12 years Admin experience" who was "[a]dept at working with little or no supervision[.]"[2]

Between April 2019 and February 2020, Lescarbeau was employed as an office administrator at Victim-2. PSR ¶ 44. In that capacity, she was responsible for assisting with certain financial transactions on behalf of Victim-2, including preparing checks as directed by Victim-2's president, interacting with property managers who received money from Victim-2 to pay for tenants who lived in subsidized housing, and creating accounting logs of Victim-2's expenses and income. To complete these tasks, Lescarbeau was given information concerning how to access Victim-2's financial accounts, including an ATM pin and an online bank account username and password.

In August 2019, Victim-2's treasurer resigned. PSR ¶ 50. Over the next six months, Lescarbeau stole $57,017.26 from Victim-2. PSR ¶ 53. She did so by: (a) opening an unauthorized PayPal account connected to Victim-2's bank account and then making 74 wire transfers totaling $29,008.26 to herself and others for her personal benefit, PSR ¶¶ 56-57; (b) initiating six unauthorized wire transfers from Victim-2's bank account totaling $18,947.54 to her landlord to pay rent and fees associated with her personal residence, PSR ¶ 58; (c) stealing two checks totaling $8,731.00 that Victim-2 had issued for legitimate business purposes, changing the name of the payee on the checks to her own name, and then depositing the checks into her personal bank account, PSR ¶¶ 59-60; and (d) making five unauthorized cash withdrawals totaling $384.46 using Victim-2's ATM card to pay for personal expenses, PSR ¶ 61.

---

[2] Lescarbeau also failed to report her employment at Victim-2 during her presentence interview. PSR p. 32, n.4.

Lescarbeau used all of Victim-2's stolen money on personal expenses. PSR ¶ 53. By way of example, she used unauthorized wire transfers to pay for numerous personal items, including: (a) $115.34 in personalized Christmas stockings and $36.50 on a baby Jesus statute on November 7, 2019; (b) $868.16 on tickets from Seat Geek on November 19, 2019; (c) $84.00 on an anxiety bracelet on November 21, 2019; (d) $19.13 on customized rings and $18.75 on Harry Styles socks on November 25, 2019; (e) $218.18 on swimsuits from SwimOutlet.com on December 9, 2019; (f) two charges of $225.00 and $166.50 at a Go-Kart track on December 12, 2019; (g) $704.75 in tickets from Ticketmaster on December 11, 2019; (h) $743.74 in items from Best Buy on December 17, 2019; (i) $150.00 in items off of Amazon on December 19, 2019; and (j) $127.99 on AirGrip Micro Airball pillows on January 17, 2020. PSR ¶ 56.

Lescarbeau also made over 20 cash transfers out of Victim-2's bank account to her personal bank account, and, thereafter, used Victim-2's stolen money on additional personal expenses. PSR ¶¶ 56-57. By way of example, on December 6, 2019, Lescarbeau's personal bank account had a balance of $226.53. PSR ¶ 57(g). On December 6 and 9, 2019, Victim-2's PayPal account made two unauthorized wire transfers from Victim-2's bank account totaling $1,265.00 to "Nicole Coulibaly." This stolen money, minus PayPal fees, was deposited into Lescarbeau's personal bank account on December 16, 2019. By the end of the month, Lescarbeau had spent $4,482.89 from her bank account on personal items, including food (*e.g.*, $74.37 to Door Dash for food from the Cheesecake Factory), entertainment (*e.g.*, $6.99 to Disney for its streaming service), and cosmetics (*e.g.*, $224.83 to Lush Cosmetics for various products).

Lescarbeau, as with her embezzlement from Victim-1, took steps to conceal her theft from Victim-2. PSR ¶¶ 62-66. For example, in December 2019, Lescarbeau sent Victim-2's new treasurer a report purporting to reflect Victim-2's expenses and income from October 2019 through

December 2019. PSR ¶ 62. The report reflected sixteen entries with $46,063.76 in expenses. Victim-2's bank account records for the same period, however, actually contain 81 entries with $74,973.00 in expenses. Notably, the report sent by Lescarbeau did not contain any of the unauthorized payments she made to herself or others for her personal benefit, including the stolen checks, PayPal transfers, or payments to her landlord.

In January 2019, after she had been arrested and detained in connection with her embezzlement from Victim-2, Lescarbeau sent a letter to President Joseph Biden that, in sum and substance, requested a pardon. PSR ¶¶ 69-71. In that letter, she explained she stole from Victim-1 "to finance some projects overseas that my husband was sure would make money quickly so we could pay the money back[,]" PSR ¶ 69, and that she stole from Victim-2 after receiving an eviction notice because her husband failed to pay the rent, PSR ¶ 70. Lescarbeau's letter continued:

> I did the crime—yes, I admit it. I am ashamed, embarrassed & remorseful. . . . I believed my husband too may times & it cost me my freedom & my integrity & my children. But it's my fault. I am not blaming him or anyone else.

PSR ¶ 71.

## II.  THE SENTENCING GUIDELINES

At sentencing, Lescarbeau will stand convicted of four counts of wire fraud, six counts of bank fraud, and one count of aggravated identity theft. The parties entered into two plea agreements to resolve these charges before the Court consolidated her two cases for sentencing. *See* 18-cr-10345-RGS, Dkts. 58 & 84; *see also* 21-cr-10139-RGS, Dkts. 18 & 20.

The first plea agreement addressed Lescarbeau's embezzlement from Victim-1. Under the terms of that agreement, Lescarbeau's Sentencing Guidelines for the bank and wire fraud charges are calculated as follows:

|  | Level | U.S.S.G. Section |
|---|---|---|
| Base Offense Level | 7 | 2B1.1(a)(1) |
| Gain/Loss Amount | +14 | 2B1.1(b)(1)(H) |
| Abuse of a Position of Trust | +2 | 3B1.3 |
| Total Offense Level | 23[3] |  |
| Sentencing Guideline Range | 46 to 57 months |  |

A term of 24-months must also be added to run consecutive to any other term of imprisonment on the aggravated identity theft charge. *See* U.S.S.G. § 2B1.6. Accordingly, based on the above calculation for the fraud charges, Lescarbeau's total Sentencing Guideline Range under the first plea agreement is 70 to 81 months.

The second plea agreement addressed Lescarbeau's embezzlement from Victim-2, which was not discovered until after the parties entered their first plea agreement. Under the terms of the second plea agreement, Lescarbeau's Sentencing Guidelines are calculated as follows for her offense against Victim-2:

|  | Level | U.S.S.G. Section |
|---|---|---|
| Base Offense Level | 7 | 2B1.1(a)(1) |
| Gain/Loss Amount | +6 | 2B1.1(b)(1)(D) |
| Abuse of a Position of Trust | +2 | 3B1.3 |
| Offense on Pre-Trial Release | +3 | 3C1.3 |
| Acceptance of Responsibility | -3 | 3E1.1 |
| Total Offense Level | 15 |  |
| Sentencing Guideline Range | 18 to 24 months |  |

After the parties entered into the above plea agreements, Lescarbeau's cases were consolidated for sentencing. As a result, the Probation Department takes a different approach, resulting in the following calculation for Lescarbeau's fraud-related charges:

---

[3] This plea agreement originally contemplated a three-level reduction for acceptance of responsibility. However, the plea agreement further stated: "Defendant also understands that the government will object to any reduction in her sentence based on acceptance of responsibility if . . . by the time of sentencing. Defendant has committed a new federal or state offense[.]" Accordingly, since she will stand convicted of federal crimes related to her embezzlement while on pre-trial release from Victim-2, Lescarbeau is not entitled to an adjustment for acceptance of responsibility under the terms of the parties' first plea agreement.

|  | Level | U.S.S.G. Section |
|---|---|---|
| **Base Offense Level** | 7 | 2B1.1(a)(1) |
| **Gain/Loss Amount** | +14 | 2B1.1(b)(1)(H) |
| **Abuse of a Position of Trust** | +2 | 3B1.3 |
| **Offense on Pre-Trial Release** | +3 | 3C1.3 |
| **Acceptance of Responsibility** | -2 | 3E1.1(a) |
| **Total Offense Level** | 24 |  |
| **Sentencing Guideline Range** | 51 to 63 months |  |

The Probation Department also notes that the portion of this Sentencing Guideline Range deemed attributable to the offense committed during pre-trial release must run consecutive to any other sentence,[4] PSR at p. 38, and that a 24-month term of imprisonment for aggravated identity theft must also run consecutive to any other sentence. PSR ¶ 129.

III.   **SENTENCING RECOMMENDATION**

Lescarbeau's criminal conduct warrants a meaningful term of incarceration. In light of the relevant Section 3553 factors, the government respectfully submits that a sentence of imprisonment for 75-months, followed by 36-months of supervised release, a fine at the low end of the guideline range, $1,196,197.41 in restitution, and forfeiture as set forth in prior filings, *see* 18-cr-10345-RGS at Dkt. 60 (requesting a $1,139,287.74 money judgment); and 21-cr-10139-RGS at Dkt. 24 (requesting a $56,963.67 money judgment), is "sufficient, but not greater than necessary," to satisfy the purposes of sentencing in this case.[5]

---

[4] A term of imprisonment imposed under 18 U.S.C. § 3147 must run consecutively to any other term of imprisonment. U.S.S.G. § 3C1.3. Accordingly, the Sentencing Guidelines instruct that sentences imposed for violations committed on pre-trial release should be divided on the judgement form between the sentence attributable to the underlying offense and the sentence attributable to the enhancement. *Id*., Application Note 1.

[5] A term of 75-months' imprisonment falls within the Sentencing Guideline Ranges as contemplated by parties' plea agreements and as calculated by the Probation Department. This is true even if the defendant is awarded a three-point reduction for acceptance of responsibility.

### A. Nature, Circumstances, and Seriousness of the Offenses

The seriousness of Lescarbeau's offenses cannot be overstated. She treated her employer's money as a piggybank to fund her lifestyle. This was not a single act of poor judgement. It was a pervasive scheme that lasted nearly the entirety of her employment at two different non-profits. For almost seven years, Lescarbeau stole from her non-profit employers—hundreds of times—to maintain a lifestyle to which she had grown accustomed and to finance her spouse's overseas business ventures. In so doing, Lescarbeau knowingly stole from non-profits who, pursuant to their stated missions, would have used those funds for charitable endeavors.

Her actions had a direct and serious impact on her non-profit employers. As an initial matter, Lescarbeau's victims suffered extreme financial harm. *See, e.g.*, Victim-1 Chief Executive Officer Impact Statement. These monetary losses, however, only represent a part of the damage caused by Lescarbeau. For example, as a direct result of this defendant's theft, numerous charitable endeavors were either indefinitely placed on hold or altogether abandoned. *See, e.g., id.* at 2-4. And, while her employers suffered financial and other harm, Lescarbeau personally benefited. She, together with her spouse, may have initially sought to use the stolen money to finance "projects overseas" to make "money quickly." But, when those projects failed to come to fruition, Lescarbeau did not stop. Rather, she continued to loot her employers to pay for a lifestyle well-above her legitimate means.

Lescarbeau was deliberate and calculating throughout her scheme. At each turn, she sought to cover her tracks. To mislead her employers, she created false expense logs, fake bank account records, and fraudulent invoices. To further her scheme, she stole the identities of two colleagues to make it appear as if fraudulently issued checks were, in fact, legitimate. To expand her scheme, she disguised her identity, by using her married name, so her second victim would not discover

9

the charges stemming from her prior embezzlement. And, despite those prior charges, she shamelessly told Victim-2 during the application process that she was "[a]dept at working with little or no supervision[.]"

When no one else was watching, Lescarbeau showed no signs of remorse, no hesitation, and no indication of slowing down. In each instance, her embezzlement came to an end only after her employer discovered her scheme. And, shockingly, being charged, arrested, and pleading guilty were barely speed bumps for Lescarbeau. At a time when most would have abandoned their criminal activities, while out on pre-trial release awaiting sentencing on her initial charges, this defendant simply pivoted to defrauding another non-profit to maintain her desired lifestyle.

**B. Need to Promote Respect for the Law and Just Punishment**

Lescarbeau's offenses, while white-collar in nature, require a significant term of imprisonment. Failure to do so would send the message "that would-be white collar criminals stand to lose . . . practically none of their liberty." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006). For this reason, courts have routinely held that white-collar criminals, like their blue-collar counterparts, should be sentenced to terms of imprisonment that both promote respect for law and ensure just punishment regardless of socio-economic status. *See, e.g., United States v. Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012) ("it is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction."); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (noting the desirability of minimizing "discrepancies between white- and blue-collar offenses").

A significant term of imprisonment is particularly warranted here to promote respect for the law as Lescarbeau undermined the integrity of the criminal justice system by continuing her

criminal conduct while out on pre-trial release. *See United States v. Hernandez*, 896 F.2d 642, 645 (1st Cir. 1990) ("a defendant undermines the integrity of the criminal justice system when he commits a crime while . . . under its supervision and control[.]"); *see also United States v. Ruvalcaba*, 5:08-cr-379, 2009 WL 1707911, at *5 (N.D. Ohio Jun 18, 2009) (imposing substantial sentence on defendant whose "offenses [were] spread over numerous years because of the time he spent in prison" and court concluded that "time in prison apparently did nothing to deter [him] from committing future crimes"), *aff'd*, 627 F.3d 218, 226 (2010).

### C. Need to Afford Adequate Deterrence

The particular details of the defendant's conduct make it apparent that a meaningful period of incarceration is also needed to provide a specific deterrent. First, at the time of the offense committed against Victim-2, the defendant was under pre-trial release from this Court for her admitted theft from Victim-1. This brush with the law did not, however, dissuade Lescarbeau from engaging in further criminal activity. In fact, on the very day she stood before this Court to plead guilty to the crimes stemming from her theft from Victim-1, the defendant brazenly embezzled from Victim-2. Her continuing fraudulent activity bespeaks a risk of recidivism which demands a punishment with a significant deterrent effect.

In addition, the level of manipulation demonstrated by Lescarbeau in effecting her scheme further underscores the necessity for a term of imprisonment that will provide a specific deterrent to this defendant. Most obviously, she manipulated her positions and the trust which her two employers placed in her—bestowing her with access to the funds they would typically use on their charitable missions—to effectively use these non-profits as her personal checking account. Her raiding of these accounts was systematic and occurred over nearly the entire tenure of her employment. Perhaps most telling was that in February 2020, after she already knew she was on

11

the verge of losing her job due to Victim-2 asking about unexplained payments, the defendant granted herself a parting gift at Victim-2's expense: just days before she was terminated, she sent an unauthorized cash wire transfer to herself in the amount of $576.00. *Compare* PSR ¶¶ 63-66 (detailing inquiry concerning unexplained payments out of Victim-2's bank accounts from February 7, 2020), *with* PSR ¶ 56 (showing cash transfer on February 10, 2020). This last fraudulent act, perpetrated almost literally as the defendant was on her way out of the door, indicates not only a disdain for her employer, but a willingness to pursue her criminal endeavors to the very end.

This case also calls for a term of imprisonment in order to provide a general deterrent to others who would contemplate engaging in white collar crime of this nature. The First Circuit has recognized that the concept of general deterrence is particularly important in determining an appropriate sentence in white collar crime cases, specifically noting that the deterrence of such crime was "of central concern to Congress." *Mueffelman*, 470 F.3d at 40; *see also, United States v. Livesay*, 587 F.3d 1274, 1279 (11th Cir. 2009) (vacating a sentence of 60-months' probation for conviction of securities fraud and conspiring to commit wire fraud in part because "the threat of spending time on probation simply does not, and cannot, provide the same level of deterrence as can the threat of incarceration in a federal penitentiary for a meaningful period of time.").

### D.  Need to Avoid Unwarranted Sentence Disparities Among Defendants

The Sentencing Guidelines reflect the consensus that those convicted of economic crimes should not be able to avoid incarceration, even where those crimes are a defendant's first offense. The legislative history of the Sentencing Reform Act of 1984 indicates that one of the Act's goals was to rectify the serious problem that white-collar offenders were not being adequately punished. *See* S. REP. NO. 98-225, at 77 (1983) ("[S]ome major offenders, particularly white-collar offenders

12

. . . frequently do not receive sentences that reflect the seriousness of their offenses."). As then-Judge Breyer, an original member of the Sentencing Commission, explained:

> The Commission found in its data significant discrepancies between pre-Guideline punishment of certain white-collar crimes, such as fraud, and other similar common law crimes, such as theft. The Commission's statistics indicated that where white-collar fraud was involved, courts granted probation to offenders more frequently than in situations involving analogous common law crimes; furthermore, prison terms were less severe for white-collar criminals who did not receive probation. *To mitigate the inequities of these discrepancies, the Commission decided to require short but certain terms of confinement for many white-collar offenders*, *including tax, insider trading, and antitrust offenders, who previously would have likely received only probation.*

Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 HOFSTRA L. REV. 1, 20–21 (1988) (emphasis added and citations omitted).

In accordance with this principle, defendants who perpetrate frauds comparable to Lescarbeau's—namely, offenses where the primary sentencing guideline is Section 2B1.1—are routinely sentenced to terms of imprisonment within the Guideline Sentencing Range. Notably, in the First Circuit between 2006 and 2017, over 73% of defendants sentenced pursuant Section 2B1.1 received terms of imprisonment within or above the Guideline Sentencing Range, or, although not applicable here, within a government-sponsored range such as pursuant to Section 5K1.1. *See* Exhibit A (United States Sentencing Commission Graph of Sentences Pursuant to Sections 2B1.1 Relative to the Guideline Range).

Sentences imposing terms of imprisonment within the Sentencing Guidelines Ranges are particularly commonplace when the loss amount, as here, imposes a significant enhancement. *See, e.g., United States v. Stergios*, 659 F.3d 127, 130-31 (1st Cir. 2011) (affirming 80 month-term of imprisonment for defendant convicted of bank fraud that resulted in a Sentencing Guideline Range of 70 to 87 months); *see also United States v. Beverley*, 775 Fed. App'x 468, 472 (11th Cir. 2019) (affirming 90 month-term of imprisonment for defendant convicted of wire and tax fraud that

13

resulted in a Sentencing Guideline Range of 87 to 108 months). That is due, in part, to the fact that under the Guidelines "loss serves as a measure of the seriousness of the offense and the defendant's relative culpability[.]" U.S.S.G. 2B1.1 bkgd. cmt.

In addition to reflecting the severity of Lescarbeau's offense, moreover, anchoring her sentence to the Sentencing Guideline Range serves the vital goal of uniformity and fairness in sentencing. To be sure, "[i]n accord with 18 U.S.C. § 3553(a), the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence." *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). Nevertheless, it remains the case that "the Commission fills an important institutional role: It has the capacity courts lack to base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." *Id.* at 108-09 (internal quotation marks omitted). Thus, "in the ordinary case, the Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Id.* at 109 (internal quotations omitted).

Furthermore, the Guidelines are often the sole means available for assuring some measure of uniformity in sentencing, fulfilling a key Congressional goal in creating the Sentencing Commission in the first place. Reference to the Guidelines, while carefully considering the Section 3553(a) factors particularly relevant to an individual defendant, is the only available means of preventing sentencing determinations from varying based on the luck of the judicial draw.

## CONCLUSION

For her actions, Lescarbeau should be sentenced to 75-months of incarceration, followed by 36-months of supervised release, a fine at the low end of the guideline range, restitution in the amount of $1,196,197.41, and forfeiture as set forth in the government's prior filings.

                                                                                   NATHANIEL R. MENDELL
                                                                                   Acting United States Attorney

By:   */s/ Justin D. O'Connell*
        JUSTIN D. O'CONNELL
Date: June 18, 2021                        Assistant United States Attorney

**CERTIFICATE OF SERVICE**

    I hereby certify that a true copy of the above document was served upon the attorney of records for each other party by CM/ECF on June 18, 2021.

By:    */s/ Justin D. O'Connell*
             JUSTIN D. O'CONNELL
Date: June 18, 2021              Assistant United States Attorney